**SIGNED this 20th day of September, 2007.**

_____
**FRANK R. MONROE**
**UNITED STATES BANKRUPTCY JUDGE**

_____

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| IN RE: | ) |
| | ) |
| SPILLMAN DEVELOPMENT GROUP, LTD. | ) CASE NO. 05-14415-FM |
| DEBTOR | ) (Chapter 7) |

**<u>MEMORANDUM OPINION</u>**

The Court held a hearing on July 18, 2007 on the Final Fee Application of Hohmann, Taube & Summers, LLP, Counsel for Debtor in Possession ("Fee Application"). Such Fee Application was objected to by Fire Eagle, LLC, the primary creditor in the case at that time. At the end of the hearing, the Court took the matter under advisement. This Memorandum Opinion shall constitute Findings of Fact and Conclusions of Law as required by Bankruptcy Rules 9013 and 7052. This is a core proceeding under 28 U.S.C. §157(b)(2) as it is both a matter which arises in a case under Title 11 and a

1

matter which arises under Title 11.  The Court, therefore, has the jurisdiction to enter a final order under 28 U.S.C. §1334(a) and (b), 28 U.S.C. §157(a) and (b)(1), 28 U.S.C. §151 and the Standing Order of Reference of all Bankruptcy Matters to this Court by the United States District Court of the Western District of Texas, Austin Division.

## Background Facts

This Chapter 11 case was instituted by a Voluntary Petition filed August 1, 2005.  The Debtor remained in possession of the estate's assets and was authorized to continue the business of the Debtor pursuant to various Orders authorizing the use of cash collateral, such Motions being originally objected to by Fire Eagle, LLC.  The Schedules and Statement of Affairs were filed August 17, 2005.  The primary asset of the Debtor was a ground lease for the golf course known as Falcon Head Golf Course in the area of Lake Travis at 15201 Falcon Head Blvd., Austin, Tx.  The Debtor scheduled the market value of such lease at $7,212,611.00. Secured claims were listed in the amount of $13,705,611.02.  These consisted of $8,091,821.25 owed on the first lien indebtedness to American Bank of Texas; $4,794,191.77 owed to Fire Eagle, LLC,; and $819,598.00 owed to Phillips and Jordan, Inc.  The Debtor scheduled unsecured claims in the amount of $2,375,467.56.

The business of the Debtor was generating an operating profit, but not to the extent necessary to meet debt service.

It was obvious to the Court at the earliest moment that the Debtor was not going to be able to be reorganized except with the consent of its creditors.  Counsel of the Debtor in possession admitted such at the first hearing on the Debtor in possession's request to use cash collateral.  Counsel for the Debtor in possession disclosed early on, and maintained the position throughout the case, that this was a liquidating Chapter 11.  It was the Debtor in possession's consistent position that the golf course, together with attendant miscellaneous property and leases, would have to be sold as an ongoing entity to the highest bidder.

It was also disclosed early on by counsel for the Debtor in possession that an entity composed of some of the insider equity owners of the Debtor would be making an initial offer to purchase the golf course as a "stalking-horse" bidder.  Such insider equity owners always had independent counsel.

Fire Eagle was very active in the case.  On September 1, 2005, Fire Eagle filed a motion to compel the Debtor's general partners to file schedules and statements of affairs in accordance with Bankruptcy Rule 1007(g).  Specifically, Fire Eagle wanted the general partner(s) to file statements of assets and liabilities that such general partner(s) owned and owed.  It also objected to the Debtor in possession's request to use cash collateral and was involved in the resolution of that issue.

Hurricane Katrina hit New Orleans at the end of August 2005 causing severe devastation. Such devastation included the flooding of the offices of Fire Eagle LLC, which was an entity owned by the pension fund for the New Orleans firefighters. As a result of such flooding, Fire Eagle lost all of its documents relating to its loan to the Debtor.

Nothing of substance happened until April 24, 2006 when the Debtor in possession filed a Motion for Orders Approving Sales Procedures ("Sales Motion") in connection with its proposed disposition of the golf course. That Motion contained the stalking horse bid of Falcoln Golf Course Partners, Ltd. for the purchase of the golf course and related assets for $5,500,000.00. The hearing on the Motion was set for May 22, 2006.

In response to such Motion, and instead of requesting that it be allowed to be a §363(k) bidder under the Sales Motion, Fire Eagle filed a Chapter 11 Plan and Disclosure Statement on May 16, 2006. It also objected to the Debtor in possession's Sales Motion. During this point in time, Fire Eagle was also active in seeking, and taking, Rule 2004 examinations of the Debtor.

On June 7, 2006, an Order approving the Sales Motion was entered in accordance with the Court's ruling at the hearing which had modified the Motion in some respects.

On June 14, 2006, the Debtor filed its own Plan and Disclosure Statement which proposed to implement the sales procedures approved by the Court through the plan process.

4

Amended Plans were filed.

The parties began to increasingly poke each other in the eye through various motions, maneuvering, and machinations related to their Plans.

Amended plans and disclosure statements were filed.

Hearings were set to consider confirmation of the plans.

Various motions and responses relating to the plans were filed by which each party attempted to gain an advantage over the other.

A valuation hearing was held to value the Debtor's golf course and attendant assets for the purposes of the plans.

Sanctions motions were filed.

Creditors' claims were objected to.

Fire Eagle filed a motion to appoint a trustee.

The parties were in full combat gear sparing no expense.

Prior to the hearing on confirmation, and pursuant to pressure applied by American Bank of Texas in the form of pleadings supporting the Debtor's Plan and objecting to Fire Eagle's Plan, Fire Eagle purchased the first lien indebtedness of American Bank of Texas for approximately $9,100,000.00.

Time is too short to fully explain all of the legal maneuvering undertaken by Fire Eagle and the Debtor from the filing of the Sales Motion on April 24, 2006 (that being docket item No. 69) to October 25, 2006, the date on which the Debtor's Amended Chapter 11 Plan was denied confirmation – (we are at docket item No. 280 by this time).  By November 2, 2006, the date of the

hearing on the Plan of Fire Eagle we were at docket item No. 312. Fire Eagle withdrew its Plan at that time due to the criticism of the Court with regard to the patent unconfirmability of its Plan and apparently in recognition that proceeding further to seek confirmation would have been a colossal waste of time.

The Debtor's Plan had been denied confirmation primarily because the Court found it had been proposed in bad faith. Specifically, the Court found that there had been an inadequate attempt to market the property to bona fide third party purchasers, and, more importantly, a failure to disclose that the insider "stalking horse" group proposing to purchase the golf course also owned, through another entity, the adjoining property which they were in the process of developing with a major national hotel chain in hopes of putting the two properties together as a five-star hotel/golf course resort.

Frustrated with the inability/unwillingness of Fire Eagle and the Debtor to seek a reasonable solution to the stalemate they had created through their own version of a Vietnam-like guerilla warfare, the Court ordered a sale. The equity owners interested in purchasing the property were allowed to bid cash and Fire Eagle was authorized to bid its claims under §363(k). The sale ultimately occurred and Fire Eagle was the successful bidder buying the property pursuant to its §363(k) bid for $9,300,000.00 [approximately $200,000.00 in excess of the first lien indebtedness it had purchased from American Bank of Texas].

During this period of time, the Debtor in possession had also paid approximately $750,000.00 to Fire Eagle as its cash collateral generated from the operation of the Debtor's business. Therefore, through the exercise of its §363(k) bid and by receipt of $750,000.00 in cash collateral generated from the Debtor in possession's operations, Fire Eagle received approximately $1,000,000.00 in credits on its 2nd lien indebtedness.

Since the sale, the case has degenerated into an extremely heated dispute as to whether or not the §363(k) bid of Fire Eagle extinguished the first lien indebtedness purchased by it from American Bank of Texas and, therefore, the liability of the guarantors of that first lien indebtedness (for the most part the same individuals who comprised the "stalking horse" group.). Both the Debtor in possession and certain of those guarantors filed pleadings in this Court requesting a determination of the effect of Fire Eagle's §363(k) bid. All of that remains ongoing in one stage or another and the ultimate determination thereof will, no doubt, certainly reach into the stratospheres of the federal appellate court system together with the Court's determination of this instant contested matter. After all, why settle?

## The Objection

Fire Eagle, in its standard overstated rhetoric, has objected to counsel for Debtor in possession's fees because "[a]pplicant has failed to identify any benefit to unsecured creditors in regards to

7

any of the work or expenses for which compensation was requested." See the objection of Fire Eagle LLC at paragraph 2. By the time of the hearing on the Final Fee Application, Fire Eagle's posture had softened to some extent although the "hard ball" nature of its modus operandi was still in effect.

## Issue

What fees are compensable to Hohmann, Taube & Summers, LLP as counsel for the Debtor in possession pursuant to relevant Fifth Circuit authority?

## Legal Standard

The legal standard applied to fees for professionals entitled to seek compensation under §330(a) in the Fifth Circuit was, for quite some time, settled.

> In essence, §330(a)(1)required the court to engage in a two-step analysis, by first ascertaining the nature and extent of the necessary and appropriate services rendered by the professional, and then assessing the reasonable value of those services. The resulting product called "lodestar" was then presumed to be a reasonable fee. (Citations omitted). In the Fifth Circuit, this two-step analysis did not end the inquiry, a third-step of adjusting the resulting lodestar up or down based on the *Johnson* factors was required. (Citations omitted). ...... Also, the Fifth Circuit has repeatedly stated that "[t]he lodestar may be adjusted according to a *Johnson* factor only if that factor is not already taken into account by the lodestar." (Citations omitted). *In re Gadzooks, Inc.,* 352 B.R. 796, 805-806 (Bankr. N.D. Tex. 2006).

After the Bankruptcy Reform Act of 1994, 11 U.S.C. §330(a)(3) read in pertinent part as follows,

> In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors including
>
>                          \*\*\*
>
> (C) whether the services were necessary to the administration of, <u>or beneficial at the time the services were rendered toward the completion of</u>, a case under this title;.

Subsection (a)(4)(A) further provided that,

> Except as provided in paragraph (b), the court shall not allow compensation for – (ii) services that were not – (I) <u>reasonably likely to benefit the debtor's estate</u>. (Emphasis added) 11 U.S.C. §330(a)(3); 11 U.S.C. §330(a)(4)(A).

Accordingly, up until the Fifth Circuit decision in *Matter of Pro-Snax Distributors, Inc.*, 157 F.3rd 414 (5th Cir. 1998), it was abundantly clear that bankruptcy courts were to make the analysis and determination of benefit of the professional's services "at the time at which the service was rendered". 11 U.S.C. §330(a)(3)(C) and (4)(A).

The Fifth Circuit in *Pro-Snax* clouded the issue as it specifically rejected determining the benefit at the time the services were performed. The Court stated,

> The other task to which the appeal commends us is deciding which standard must apply to A&K's services rendered before the appointment of the trustee. A&K argues that a reasonableness test is appropriate – <u>whether the services were objectively beneficial toward</u>

> <u>the completion of the case at the time they were performed</u>.  The Petitioning Creditors, by contrast advocate a more stringent test – <u>whether A&K's services resulted in an identifiable, tangible, and material benefit to the bankruptcy estate</u>.  **<u>We determine today that the stricter test is the appropriate measure</u>**.  (Emphasis added).  *Pro-Snax* at 426.

Further, the Court opined that,

> ... but we are disinclined to hold that any service performed at any time need only be reasonable to be compensable.  Id.

For further emphasis the Circuit stated,

> While our ruling may not change the ultimate award to A&K, we believe it important to stress that any work performed by legal counsel on behalf of a debtor must be of material benefit to the estate.  (Citation omitted). Id.

However, after making the above-cited statements, the Court then further muddied the water by stating,

> The district court's instruction to the bankruptcy court to consider strongly the debtor's lack of success in obtaining confirmation of the Chapter 11 plan is consistent with the standards identified by Congress in §330, which <u>require that – at the time the services are performed – the chances of success must out weigh the cost of pursuing the action</u>.  (Emphasis added) Id.

And, in making its ultimate ruling, the Fifth Circuit did at first appear to make the benefit analysis at the time the services were rendered.  This is clear from the Court's statement, that,

> We find that A&K should have known from the outset that the Debtor's prosecution of a Chapter 11 plan would fail, given that the Petitioning Creditors – who collectively held more than 50% of the indebtedness in this case – filed an involuntary *Chapter* 7 case against the Debtor

and repeatedly informed the Debtor and the bankruptcy court that they believed the case should be administered under Chapter 7.  FN 17

However, footnote seventeen states something different:

> FN 17.   We believe that these facts necessarily should have led A&K to the conclusion that its services were futile, meaning that we would find against A&K <u>even if we today adopted the reasonableness standard that it suggests</u>.  (Emphasis added). Id.

Apparently, what the Fifth Circuit did was to adopt the stricter standard – the services must result in an identifiable, tangible and material benefit to the bankruptcy estate – and then make the benefit analysis on the basis of the reasonableness test just to show that the fees should be denied whichever standard was used.

Unfortunately, that does not clear up the issue.

The statute requires that the benefit analysis be performed at the time the services are performed.  See 11 U.S.C. §330(a)(3)(C) and (4)(A).  The Fifth Circuit in *Pro-Snax,* however, requires there be an identifiable, tangible, and material benefit.  It seems to this Court that those two standards are necessarily mutually exclusive concepts as one can rarely point to having accomplished an identifiable, tangible and material benefit at the time one is providing the service which will hopefully lead to such identifiable, tangible and material benefit.  The converse is also true.  An analysis at the end of the rendering of services based upon whether one's services resulted in an identifiable, tangible

and material benefit necessarily precludes viewing the benefit anticipated by the rendering of the services at the time they are rendered as the statute seems to require.

And, this is the exact distinction the Circuit Court made when it rejected the standard urged by A&K [which is that which the statute imposes] and adopted its own stricter test.

This distinction was specifically pointed out by the bankruptcy court in the case of *In re Quisenberry,* 295 B.R. 855, 865 (Bankr. N.D. Tx. 2003) wherein the court stated,

> In the Fifth Circuit, this test does not look at the reasonableness of services or expenses at the time that the services or expenses are incurred. *See In the Matter of Pro-Snax Distribs., Inc.,* 157 F.3d at 426. Rather the test is an objective after-the-fact-test: "Whether [] services resulted in an identifiable, tangible, and material benefit to the bankruptcy estate," regardless of the reasonableness of the services at the time they were rendered. Id. *Quisenberry* at 865.

Another court puts it this way,

> While, as indicated by the Fifth Circuit in <u>Pro-Snax</u>, a court must look to the benefit to the estate in determining whether professional fees are reasonable (*see* <u>11 U.S.C. §330(a)(3)(C))</u>, under the express language of the statute, the analysis is made "at the time at which the service was rendered" and not in hindsight. *Gadzooks* at 810.

The *Gadzooks* court concluded that,

> ...the Code does not say "services that did not benefit the debtor's estate", but rather instructs the court to look at the benefit of the services at the time they were rendered. Id.

The *Quisenberry* court followed the direction of the Fifth

Circuit in the *Pro-Snax* decision in making its analysis.  The *Gadzooks* court followed the statute in making its analysis concluding,

> ... the "benefits analysis" of *Pro-Snax* is directed to professionals for the debtor who knew that their efforts were futile, and therefore any time incurred by them was unreasonable at the time the fees were incurred. *Gadzooks* at 812 - 813.

In the face of all the above, the question remains: What is the standard to be applied: The statute or *Pro-Snax* ?

One way of potentially merging these two standards is to require both to be met, i.e. the services must both be beneficial toward completion of the case at the time they are rendered and they must produce an identifiable, tangible, and material benefit to the estate.  However, in this combined state it seems the latter consumes the former as it is hard to imagine any situation where the latter exists and the former does not.  However, the former clearly could exist without the latter.  That is to say that services rendered could have been 1) "beneficial at the time at which the services were rendered toward the completion of the case [11 U.S.C. §330(a)(3)(C)] but 2) failed in and of themselves to produce any identifiable, tangible, and material benefit to the estate as viewed in hindsight.  So, exactly what is the inquiry *Pro-Snax* demands?  Has a new requirement to those contained in §330 been added or has the phrase "beneficial at the time at which the services were rendered" been redefined to <u>include</u> the

requirement of an actual benefit at the end?  Perhaps we'll find out when this matter reaches the circuit court. Either way, it is something that we must address.

## ANALYSIS

At issue is the allowability of the fees and expenses of counsel for Debtor in possession for the entirety of the case.  The Court has reviewed the First, Second, and Third Fee Applications as well as the Final Fee Application.  The Court has spent an extensive amount of time reviewing the individual daily time records of the various professionals of the applicant submitted in support of the Application.  The Court does not find fault with any of the individual time entries per se.

Fees are requested in the total sum of $252,176.45.  After application of $25,000.00 pre-petition retainer and earlier payments authorized by the Court with reference to the allowance of the interim fee applications [all subject to final allowance], there remains owed and unpaid $121,505.53.

Expenses requested to be reimbursed total $23,503.03 of which only $1,516.62 remains outstanding.

The hourly rates charged by each of the professionals of applicant rendering services are reasonable according to the community standards in which they were rendered, although they are at the very top end of that reasonableness scale.  The average hourly rate charged was $316.63.  This indicates that most of the

14

work performed in the case was rendered by the two most senior lawyers on the file.

There are no other co-equal administrative claimants in this case. The fees, to the extent allowed, will be paid out of the cash collateral of Fire Eagle pursuant to the carve out provisions of the First Amended Agreed Final Order Authorizing Use of Cash Collateral entered September 6, 2005.

The services rendered break down into the following categories:

1.  General services related to the filing and the initial stage of the case generated fees of $5,984.25 and expenses of $173.94. At the hearing Fire Eagle stated that it had no objection to these fees.

2.  Services rendered with regard to the Debtor's operations in Chapter 11, cash collateral issues, other financing/credit issues, sale issues, negotiations dealing with secured and other individual creditors, and other creditor issues generated requested fees of $63,213.50 and expenses of $7,441.03 ("Cash Collateral/Business Operations"). Fire Eagle objects to these as excessive and not producing the necessary benefit to be compensable.

3.  Services rendered in the catch-all category of "Case Administration" relating to revising schedules and statements of affairs, reviewing the monthly operating reports, dealing with the U. S. Trustee, and attending to general case matters generated a

request for fees of $50,686.00 and expenses of $2,692.08 ("Case Administration"). Fire Eagle objects to these fees as excessive and to the extent required not producing the necessary benefit to be compensable.

4. Services rendered with regard to claims, primarily that of Prosperity Bank, resulted in fees requested of $4,790.50 and expenses of $12.03. At the hearing, Fire Eagle stated that it had no objection to these fees.

5. Services rendered in connection with the preparation, filing, and prosecution of employment and fee applications resulted in fees requested of $7,420.00 and expenses of $437.43. At the hearing, Fire Eagle stated it had no objection to these fees.

6. Services rendered in connection with the formulation and prosecution of Debtor's plan(s) and disclosure statement(s) and opposing that of Fire Eagle generated a request for fees in the amount of $120,082.00 and expenses in the amount of $12,746.52. Of this amount $20,000.00 was earmarked as the amount expended in opposing the Fire Eagle plan ("Plans"). That means $100,082.00 of fees is requested for pursuing confirmation of Debtor's plan. Fire Eagle strenuously objects to the allowance of fees in this category as producing no benefit to the estate.

The services rendered in the categories set forth above not objected to by Fire Eagle are compensable under 11 U.S.C. §330(a)(3)(C) as they were clearly "necessary to the administration of" this case. Considering the time spent on the services and the

rate charged for the services, the Court determines that they were performed "within a reasonable amount of time commensurate with the complexity, importance and nature of the problem, issue or task addressed" as the statute requires.  See 11 U.S.C. §330(a)(3)(D).

With regard to the services rendered in the Cash Collateral/Business Operations, Case Administration, and Plans categories, the Court finds that the services were both necessary and beneficial at the time at which the services were rendered toward the completion of the case as required by 11 U.S.C. §330(a)(3)(C).  The Court has already determined that the rates charged for the services, although at the high end of the spectrum in this community, are reasonable taking into account the complexity and nature of the problem/issues at hand in this case. However, the time spent on such services appears excessive in light of the fact that the Debtor's operations and creditor structure were not overly complicated and, in large part, most of the fees generated were primarily a result of the Debtor's dispute with Fire Eagle.

Cash Collateral/Business Operations generated a fee request of $63,213.50 and included matters relating to cash collateral, financing/credit issues, the Debtor's operations in Chapter 11, negotiating and dealing with secured and other individual creditors, and sale issues.  To some extent, these services overlapped with the services rendered in the Plans category since the Debtor's plan contemplated a sale of the Golf Course as an

17

operating entity pursuant to the Order that was entered upon the Debtor's Sales Motion.  These two categories in large part constitute the "meat" of the services rendered with regard to the bankruptcy/reorganization issues in this case that needed to be addressed.

The services rendered in the Case Administration category were more perfunctory, routine, and administrative in nature.  As such, they were matters that were both "beneficial at the time at which the service was rendered toward completion of", and also "necessary to the administration of" this case within the meaning of those phrases as used in 11 U.S.C. §330(a)(3)(C).  The time in the Case Administration category is, however, excessive in light of the fact that they were primarily administrative in nature and could have been more efficiently performed by professionals with a lower billing rate.  These fees will be reduced by $17,500.00 [approximately 35%].

The time rendered in the Cash Collateral/Business Operations and Plans categories is likewise excessive with one caveat, $20,000.00 was earmarked as representing the services rendered in opposing the Fire Eagle plan.  Such services were absolutely necessary and the amount expended therein reasonable and necessary since such plan was patently unconfirmable.  The remainder of the fees sought in these two categories is, however, excessive.  The case was simply not so complex as to justify the full amount of time spent by Debtor's counsel even though the Court acknowledges

that more time was required to be spent than one would expect in a case such as this due to the constant litigious nature of Fire Eagle. That said, Applicant and its attorneys are certainly no shrinking violets either. All things considered, the Court believes fees relating to pursuing confirmation of the Debtor's Plan should be reduced by $27,500.00 [approximately 27.5%] to be in line with the dictates of the statute.

These reductions are due to the Court's application of the language of the statute (beneficial at the time the services were rendered toward completion of the case) and not with regard to the *Pro-Snax* after-the-fact inquiry. The question then remains: To what extent has the applicant shown that these fees did, in fact, result in an identifiable, tangible, and material benefit to the estate.

While hard to fully quantify, it is clear that the services rendered by counsel to the Debtor in possession in the Cash Collateral/Business Operations category did, in fact, benefit the estate. Further, it was absolutely necessary to the proper operation of the Debtor's business and the preservation of the value of the assets owned by the Debtor's estate that these services be rendered. For example, the Debtor in possession was operating Falcoln Head Golf Course on Lake Travis. The Golf Course needed to continue to be operated, without interruption, to preserve its value as a going concern. In order to do so, the Debtor in possession needed the use of the cash collateral of the

lenders.  Negotiations had to be conducted and pleadings filed to accomplish this.  And, there were additional creditors, both secured and pursuant to lease contracts, that required attention for the case to be properly prosecuted.  This Chapter 11 Debtor required the able assistance of counsel to ensure the proper running of its operations, to ensure that it complied with the provisions of Title 11, and to preserve the assets of the estate, whatever they were, and maximize their value for the benefit of the estate and its creditors.  Here, counsel's services resulted in identifiable, tangible, and material benefits to the estate when viewed in hindsight.  The Debtor's operations produced in excess of $750,000.00 in cash collateral that was ultimately paid to Fire Eagle as the second lien holder on the property.  The property of the estate was preserved and the operations conducted were orderly and in compliance with Title 11.  When Fire Eagle took over operations pursuant to its successful §363(k) bid, it was handed a functioning and coherent business operation.  No further reduction in this category is necessary under *Pro-Snax.*

Concerning the Plans category, the Court has previously stated, and reemphasizes, that services rendered in opposing the Fire Eagle plan are allowable without reduction, that being $20,000.00.  The remaining $100,000.00 in fees in this category have already been given a 27.5% hair cut – or $27,500.00.  The remaining question is the benefit, if any, from those services.

Clearly, the Debtor in possession was required to do something

20

to get the ball rolling.  That was counsel's obligation.  Some eight months into the case it filed its Sales Motion.  This got the ball rolling.  Both Fire Eagle and then the Debtor filed competing plans and disclosure statements.  The Court believes that counsel for the Debtor in possession was obliged to engage in the plan process under the specific facts of this case in accordance with its obligation to the creditors and this estate and in accordance with the respective canons of ethics which govern applicant's rendering of legal services.  Pursuant to the plan process, the golf course property, valued at just over $7 million on the Debtor's schedules, was sold to the second lien holder (who had by that time acquired the first lien debt as well) for the total sum of $9,300,000.00 [approximately $200,000.00 in excess of the first lien indebtedness].  This was an identifiable, tangible, and material benefit to the estate.  It resulted from the plan process which was actually begun by Fire Eagle in response to the Debtor's Sales Motion.  Under these circumstances, counsel would have been negligent not to have pursued the estate's legitimate rights under Title 11 in opposing Fire Eagle's Plan and proposing its own.

A great portion of applicant's fees in the Plan category were generated in large part due to the action of Fire Eagle in opposing the Sales Motion and filing its own Plan.[1]

---

[1]  Had Fire Eagle simply participated in the sales procedure in June 2006 by insisting that it be granted its §363(k) rights at that time instead of filing its own Plan, a great deal of these fees could have been avoided. But that is certainly no grounds to disallow Applicant's fees.  The Debtor was not required to simply lay down and accede to Fire Eagle's every wish.

Over the remainder of 2006, the plan process played out and the property was sold.  The result was that the first lien debt of approximately $9,100,000.00 was fully paid and the second lien indebtedness had substantial payments made upon it.  This would not have occurred but for the process Debtor in possession's counsel's action ignited, a process it would have been derelict not to pursue.  The sales/plan process reduced the primary secured claims by more than $2.1 million in excess of the Debtor's scheduled value of $7,200,000.00 for the Golf Course property and operations while in Chapter 11 generated $750,000.00 in cash collateral that was paid to Fire Eagle.

What this means is that to the extent other assets are liquidated and/or recovered through litigation or otherwise,[2] the remaining creditors will have a greater share of whatever those assets bring.

An Order of even date will be entered.

###

---

[2]  Fire Eagle has long maintained that there exist substantial claims against insiders of the Debtor under Chapter 5 of the Bankruptcy Code and otherwise.